The first case for argument this morning is 15-1053, Army v. Kellogg Brown & Root Services. Mr. Prouty, whenever you're ready. Good morning, Your Honors, and may it please the Court. There are two issues in this appeal today, and the principal issue is whether a contractor should be able to get around contract provisions which forbid the arming of contractor or subcontractor employees by the simple expedient of hiring a subcontractor whose duty is to use weapons. Although this may seem to be a facile or trivial formulation of the issue, it is precisely what the Board held when it determined that the use of private security contractors was permitted under the contract, notwithstanding the portions of the contract that precluded the use of arms by contract personnel. Mr. Prouty, what is the status of Appeal 58583, the breach part of the case? Yes, Your Honor, I'm sorry. I didn't mean to over-speak. It's been stayed. Essentially, 58583, as you know, was brought shortly before the hearing on the consolidated cases here, and it was stayed basically pending the resolution of this appeal because, of course, if this appeal is resolved in KBR's favor, the breach doesn't matter. But if this bill is not resolved in KBR's favor, it's resolved in the government's favor, then the breach might become relevant. And would the consequence of a finding of breach in that case be that the government would lose the total of, what is it, $55 million? I wouldn't go that far, Your Honor. It would be the first step towards that because the argument has to be that there's a breach, a material breach, and that the proper result of that breach is to excuse the arming of KBR and its subcontractors. There's a remedy for the breach. Precisely. And there's been no finding that that's the proper remedy. So there would have to be two steps taken at that appeal, the breach, and then finding that the proper remedy for the breach was KBR to arm it simply. Now, let me ask you, just because there are four different numbered appeals here, and there's some disagreement, it seems, in the briefs, perhaps, perhaps not, about whether or not the statute of limitations question, it's your view, is it not, that only one of those appeals was resolved or disposed of by the statute of limitations? I would say so, Your Honor. That's right. Okay. So that, even if that were agreeable, but nothing else was, so the remaining appeals would all be subject to being put in a pot with this breach of contract case, right? It's the same issue and the same money that's at stake. It is the same money at stake, Your Honor. The breach of contract is simply sort of a backup theory. I don't want the words of KBR to smell, but they'll certainly explain it better than I will, to support their challenge to the government's determination in this case. Well, you call it a backup theory, but they may not, but it seems to me it's really, as I read the record in this case, it's really the core of the case. The whole question, the whole problem was the government, by their theory, failed to provide protection. They took measures of protecting themselves and protecting the government's supply lines, in effect, and that it was justified to do so, and it seems to me that we're dealing with something that's not really peripheral, but it's not the core of the case on this appeal, and that's frustrating in looking at this appeal that we have only a part of the appeal, in effect, before us. Sure. Well, of course, we cannot change, at this point, the procedural posture of the case of the Board of Contract Appeals, and essentially, when the prior breach theory came to the forefront, just before the hearing, the Board said, no, we're not going to go there because it would change the complexion of the hearing. It basically said, for the reasons stated by the government, and its opposition to the notion of bringing 585 and 583 into these hearings, we'll do that one later. So, but, first and foremost, there's the question of the interpretation of the contract, and that's what this appeal is primarily about. Also, of course, the statute of limitations, first of all. No, but just to stay on this point for a minute, because it is obviously troubling, because it seems to me, even if we were to agree with you on this breach of contract, I guess I'm having a hard time thinking about the Board, because there are pages and pages and pages of fact-finding here. That fact-finding may still be relevant, if not even dispositive, of the contract claims. So, I don't know what the Board does with that. If we reverse or vacate or whatever the ultimate conclusion here, I don't know what they take away with respect to all this fact-finding that's been done. Well, what they can do is they can apply that to the case that's been stated, and to be really clear, when the Army opposed, at the eve of the hearing, the bringing in of the arguments in 585 and 583, they said it's because it's unfair. We're not prepared to basically fight this battle right now. We need more time, and the Board said, you're right, Arnie. Now, the Board did make some fact-finding that appears to be about that issue to some degree. No, I understand what you're saying, but it's – I mean, there were several ways to go. I appreciate that, that you said it wasn't enough time, and the Board certainly agreed that they couldn't prepare. Of course, we wouldn't necessarily be here if the Board had just stated the earlier appeal and said we're going to give enough time so that we can do it. Let me go back to your very first sentence, which I recall you used the word forbid, the contract forbid. What was a little odd to me in the briefing was you ultimately get to that, but for example, in gray, when you're first talking about the contract, it's characterized as the contract discouraged or strongly discouraged the use. Yes, right. To me, there's a lot of distance between a contract arguably discouraging something or forbidding something. Let me step back a moment there. It must have been in there on my part, and I apologize. The point is the doctrinal documents, the Army doctrine, is that we do not want subcontractor or contractor employees to be armed because that changes their status under a law of armed conflict and Geneva Convention concerns. Basically, there are a number of doctrinal documents that are incorporated into the contract, and they say contractors are – commanders are discouraged from allowing contractors to be armed, et cetera. Now, again, that's discouraged, but that sets the stage for the later portions of the contract, and in particular, I'm thinking about section clause H21, which talks about where contractors may be armed. In H21, and that's the Joint Appendix 155, and it's called Weapons of Training, and the portion I'll read to you is, whether contractor employees will be permitted to carry a government-furnished weapon for self-defense purposes in the area of operations is in the discretion of the commander. However, contractor personnel will not possess personally-owned firearms in the AO, which is the area of operations. The government may, at its discretion, issue weapons and ammunition for M9 pistols for self-defense to contractor employees. So, what H21 does, in combination with also H16, which says that protection of the contractor employees is responsible to the government, is to forbid sort of the self-help that the KBR used here. In general, Order 1A works in your favor, too, right? Indeed. That says prohibition. It is a prohibition, and that says no personally-owned or privately-owned weapons, and that gets you to it. All those things give a coherent view, coherent with the doctrine, which is that contractor employees are basically persons accompanying the force, civilians accompanying the force, and we do not want to do anything to risk their protections under the law of armed conflict. But the board stated that providing PFCs here, their own PFCs, was reasonable, and certainly sounds reasonable. Surely. And what were they supposed to do? Not provide the materials for the fighting troops, or to go without protection? Well, there are a number of alternatives. In the first instance, it's not as if the Army required KBR or its subcontractors to go by themselves through Iraq. There was a convoy system which was used. Now, of course, when the insurgency began in mid-2003, and we said this in our brief, it took a while for everybody to get accustomed to that and get squared away, but they did. Yeah, but I understand why this is kind of maddening, your arguments here, including your other argument, the argument you make in the brief, which is, well, they could have delayed it until they could get it. I mean, you criticized the board in your brief, as I recall, suggesting, well, they looked at the facts and they were just so outraged by what's going on here, and these people were just acting to save their own lives and protect themselves, and so they were swayed by that. Frankly, shouldn't they be? I mean, you know, you can say now that, well, they have other options. Really? Really? Really, your Honor, and I'll give one clear demonstration that's true. Not every subcontractor got PSCs, and they did their jobs. One of the documents we cited in our brief was ESS. How many of these PSAs – what was the life loss with respect to contractor employers in these PSAs through the relevant period of 2003 to 2006? There is no single number in the record that I've cited. I actually thought there was something in the record of 64. There were PSCs, but again, remember, your Honor, it's not as if the Army was saying go without any protection or give PSCs. The Army provided protection and it provided – Well, the board found, and the record certainly seems to support the notion that there were many instances and sometimes extended instances in which the Army was not providing protection, but nonetheless the contractor was requiring the contractors to provide the services under the contract. So there, what's their option? Well, the option is what they did, and there was more than one instance cited in our briefs where the Army – where KBR said, look, it's not safe. We're not sending anybody. They could do that, and they did do that. And when they did that, the Army understood it, and they established a convoy, and they took the convoys, and they went out, and they gave KBR and its subcontractors the protection. But of course, these are all issues for 58583, which are not before the court right now. The issue really is simply the contract interpretation. Can I go back? Just go back to that one. Of course, Your Honor. We were discussing it before. Did anybody suggest to the Board, was it on the table that maybe you want to delay the trial with respect to these appeals pending the other one, or was it just the binary choice of whether we go on or whether we don't? Well, as far as I know, as far as I understand, basically KBR came in a month before the hearing and said we wanted to add this. And the Army said we can't add this because it's so much at the ease of trial. And the Board, of course, had the option to say, well, let's add it, but let's add it a month or two later or three months, or whatever number was right. Or KBR could have said, hey, look, we want to add 58583. Let's extend this for a month or two. And there's no indication that it happened. So we are presented with the square issue before us, which is what does the contract actually say? And KBR knew that it could modify the contract, the APSEs, and there was effort, indications they discussed it. But you can't do this self-help of ignoring the contract when it says you cannot do this. What do you say as to the provision that's exerted on JA-14, and it's quoted by the Board, where the CPA authorized possession and use of firearms and military weapons, including private security firms? Right. The CPA authorized that. But the CPA wasn't deigning to change the lockout contract. It was saying, extrinsic to the lockout contract, you can have private security contractors in Iraq. And we've never denied that there were private security contractors in Iraq. Obviously, there were, but there were different contracts. There were reconstruction contracts, which do not have the same sorts of issues with law of armed conflict. There were multiple other contracts out there, which had their own provisions, allowances, and recognition of the appropriateness or non-appropriateness of the APSEs. This contract did not, and the CPA did not deign to change the lockout contract. Yeah, but doesn't this—I mean, the argument is that this affects how we're going to interpret whether or not the contract at issue here covers these people, right? Because this, at least what the Board said about this, is Section 3, Distinguished Possession of Firearms by Private Security Firms for Possession by Other Groups or Individuals. So, if that is the case, and if that's the way that we approach this, the PSAs are kind of treated as a different category, then why should that differentiation not be applicable to the contract we're construing here? Because it was a different party construing the contract. It wasn't the Army with whom a lockout contract was made. And this is only—at most, it goes to CPA General Order 1 or CENTCOM General Order 1A. It does not go to H-21. It doesn't occur to change H-21. It doesn't talk about the lockout contract. It doesn't talk about the notion of contractors who are traveling with the force as the contract—the civilians accompanying the force, rather, which is what we had in the lockout contract. What do you say as to Commander O'Donnell's testimony, which is exerted on JA-32, about the absence of any reference in the contract to contracted security and his statement that there was no rule and, therefore, people were doing what they were. Well, Mr. O'Donnell did say that there is no reference to PSAs because there is no reference to PSAs. Because it doesn't say private security contractors. But later on, in the same—as we discussed in our brief, and I can find the number for you—basically, the next step of his testimony was, but you still couldn't have them because even though it didn't say PSAs, basically, it's not allowed in the contract because we're the ones who are to provide force protection for the contractors. So even the person cited and quoted by the board, that is an out-of-context quote. If you're to keep on reading the very next thing he said in response to the judge, oh, no, you can't— So your take on this final sentence in that paragraph 64 is that when he said there's no rule and people are doing what they want, your take is that they were doing what they want contrary to the contract. Absolutely. Which seems a little inconsistent with the idea there's no rule. Well, I think that if you were to read the entire context of this quote—that's just that quote, but also—but you still couldn't have it. You would say that people were doing things they shouldn't do. Now, remember, the same people— Well, except that if you read right before the quote, at least the board's characterization of what he was saying is even stronger. There were no theater-written policies or procedures regarding contractors carrying arms. And obviously that's not correct, because H-21 talks about how you carry arms. These, again, theater policies, which are basically across the board for all of Iraq, and not just for the lockout contract, but also for the different kinds of contracts out there that did not invoke the same law of armed conflict concerns. Yes, there were private security contractors, and that was fine. We're not saying that those private security contractors should not have been there. Is this—we know about the cases before Rossley Appeals. We know about this contract case. The Supreme Court decided the KDR case last week. Yes, Your Honor. Is there other litigation out there that is related in some way, shape, or form to this question of PSEs and their compensation? I'm not aware of any, Your Honor. I will say that at one point there was a fraud case brought, but that has been dismissed. So—under the False Paying Act. So I believe that this is it as far as matters involving payment for private security contractors. Thank you. We would love to hear from you at other times. We'll be joining you in a moment. Thank you, Your Honor. Mr. Workmaster? Yes. Good morning, Your Honors. May it please the Court. I'm Jason Workmaster with Cunnington & Burling. I'm looking at counsel tables. Alex Seria also with my firm. And I want to go right to the question that Your Honor asked about breach. And that obviously is the question that undergirds the whole case. But it's the one before us. I would— Can I just ask you— I'm sorry. Go ahead. You mentioned you were for Cunnington & Burlington. And this—the brief listing was associated with another firm. Is there another— Is it corrected? I'm just exchanging—first. Okay. Yes, Your Honor. I'm sorry. Go ahead. We would submit, Your Honor, that the question of breach was before the Board. It was tried at trial for six weeks. The parties briefed it extensively in their post-hearing briefing. We have—we put those pages into the joint appendix. We argued in our brief that under the doctrine of prior material breach, any of these alleged—you know, Mr. Prouty's argument about restraints on the use of private security, even if there were any which we deny, we were excused from complying with them because of the government's prior material, comprehensive breach of its obligation to provide force protection. But wait a minute. You have this other case pending below. You brought this other case, so you recognize there was a distinction between what this issue is about on appeal here and what is at stake in that other case, right? The other case that was brought asserts breach. The only reason that that case was brought was to avoid any question about the Board's jurisdiction over this prior material breach argument, which we would submit there is no question. The prior material breach issue, the question of whether the government breached its obligation to provide force protection was squarely within the case from the moment we filed the first appeal back in 2008. The parties both understood that. Discovery was comprehensive, covered the issue, and then when we got to trial— Wait, but did the Board understand it? I mean, why would the Board have stayed the other case? I mean, doesn't the Board believe that it's got another case that presents other issues that's pending before it? I'm not—the Board understands that there is another case, and the Board has stayed it. Our position had been, when this issue was briefed before trial, that this was just a paperwork issue. This changed nothing substantive about the trial, and then when we went to trial, it in fact did not. Well, but the Board—I know that you assert in your brief that the Board actually ruled on this issue. Yes, Your Honor. And you cite pages 38 to 39 of the JA, but I read those paragraphs over a couple of times, and I don't see that as a ruling on this issue. It's a ruling, it seems to me, on the reasonableness of the amount that was extended on the PSCs, not a ruling that there was both breach and a permissible remedy for the breach, which was exercised by KBR. So, as I read this, this issue is not before us in this appeal, contrary to your assertion in the brief. And on that, Your Honor, I don't have anything else to say on this, other than what was in the brief our position is. Am I missing something about these two paragraphs on 38 and 39, in which the Board actually says there was breach and it was permissible remedy? I'm not seeing it. I would point Your Honor to on JA 38, the last full paragraph, the first sentence of the last full paragraph, a preponderance of the evidence shows that during the years 2003 to 2006, the force protection provided by the government… I'm sorry, are you on 38? 38, yes, Your Honor. At the beginning of the last full paragraph. Yes, the beginning of the last full paragraph. A preponderance of the evidence shows that during the years 2003 to 2006, the force protection provided by the government for Contract 7 was not commensurate with the threat or with the protection provided to DOD civilians. That language, commensurate with the threat or with the protection provided to DOD civilians, tracks exactly to the language of the contract. And so the Board here is finding that the government failed to meet that obligation under the contract. That's a breach. Well, that would certainly be an unhelpful finding if it were in the other case. But unhelpful to the government. But I'm not seeing them as ultimately saying, and therefore there's a breach remediable by the self-help measures that were employed by KBR. Your Honor, if you would turn to the next page. All right. And this is the Board responding to the government's argument that everybody should have just waited around. Fortunately, this is the first full sentence at the top of JA 39. Fortunately for the troops that depended on KBRS and its subcontractors for their life support and other logistical support services, KBRS and its subcontractors did not adopt the attitude now suggested by the government as their only remedy for the government's failures to provide force protection. I understand what you're saying, but if you look at the, usually you look at the end of the paragraph to see what the conclusion is, and on the first paragraph you directed our attention to, the last sentence says, almost like accordingly, although they didn't use the word accordingly, on this record we conclude that the conditions prevailing, blah, blah, blah, the use of PSCs was reasonable if that term is defined. So they're clearly deciding the issue that we all understand here. And similarly, they, I think the conclusion in the other paragraph you directed us to, whether it goes to the question of whether they were prohibited by the terms of the contract. So you're right about those findings, and those findings, as Judge Bryson suggests, may be pretty helpful on the other case, but I guess I'm having the concern, the trouble he is, in finding out that that was really a ruling on that question. Understood. And I agree that the decision could be clearer on this issue. So I don't defend what the board did, which you spent not that much paper in your brief doing. All right. But what do you say to the discussion you're having with your friend about the terms of the contract? On the terms of the contract, as Your Honor pointed out, it was clear, on just the question of reading H-21, the various arming regulations that the government cites, they're talking about the carrying of weapons by individuals. They're talking about personal carrying of weapons. And as Commander O'Donnell testified at trial, Commander O'Donnell was not just anybody. The government called him as their witness. He was a lawyer for CENTCOM who spent time working on these very issues during the relevant time period. And as the board found, he testified that there was, that all of the regulations the government is citing were not addressing the issue that is presented by the state. I'm not understanding it, so let me be clear. H-21, are you saying that there's a distinction between – they're clearly talking about contractors carrying weapons for self-defense. Yes. So are you saying that somebody carrying a weapon for self-defense purposes is something other than the PSCs because they weren't operating and carrying weapons for self-defense? Yes, Your Honor. They were engaged in protecting others? Yes, Your Honor. So suppose that KBR had authorized its subs and its subs had an extra person on every truck who was carrying a rifle. Would that be okay under the contract in your view? The truck driver presumably can't carry a silo. There was – in fact – But suppose that they did have an extra person they put on every truck who's carrying a rifle. Is that okay under the contract? I would say that's kind of – that was actually something in the various negotiations that the government cites. That was actually something that was discussed, arming the truck drivers, having a KBR employee on the truck. Would that be consistent with the contract prohibitions against personally owned weapons? For that kind of use, that would be the kind of use I would say is contemplated by H-21. But that is a different – having extra employees on the truck versus having a contract with somebody who puts an extra employee on each truck? I'm saying there's a difference between hiring a private security company. For example, in the courthouse. If the courthouse – if the court were to determine to arm the employees who work here on a kind of a – on a personal basis, they could carry a gun. That is a different thing than if the courthouse were to decide collectively to hire a private security company. The policy considerations there are different. Is this to do with what self-defense is? Like if an employee wants to bring a gun because they're scared and they want to be able to protect themselves in case anything goes awry versus are telling them they should all have it for purposes of protecting us? That is a different thing. A private security company that is in business to make profit on the protection of others is a different thing than an individual employee carrying a gun for personal use. And that, Your Honor, I would – Does the board ever go there? I mean, does the board really make that – The board in its – in fact, the board in its – What Judge Braithwaite cited earlier seemed to kind of a little support that just because it distinguishes between the groups and so forth. But I didn't – Yes, and the board in its – early in 2012, and I don't have the JA site in front of me. In 2012, there was a pre-trial motion where the contract interpretation issue was litigated and the government moved for reconsideration. And the board issued a decision in June of 2012, June 25, 2012. And in footnote one, the board makes the distinction between arming KBRS employees and retaining a professional private armed security company having its own employees. The board made that very distinction in footnote one on page two. And then as the – back to the fundamental problem that happened here, when the KBR and the government found itself in the middle of an insurgency that had not been contemplated by the parties, by the contract provisions to which they agreed. And I think you can see from the board's decision the regulators in country were playing catch-up with what was happening on the field. You had 30,000 PSCs in country, and the CPA, the Coalition Provisional Authority, is trying to figure out how to regulate them in late 2003. And the CPA order number three on JA 14 makes the same distinction, the language Your Honor was reading. Private security, and in paragraph two of CPA order number three, addresses private security firms. Private security firms may be licensed by the Ministry of the Interior to possess and use licensed firearms in the course of their duties, including in public places. That's paragraph two. How do we know? I think one of the arguments your friend had about the relevance of this provision was that it wasn't incorporated in the contract. The government, in fact, at one point argued this provision was incorporated into the contract. The government argued back, if you look back at the decision in April of 2012, where the parties litigated the question of contract interpretation, the government relied on CPA order number three and said that this licensing requirement was another provision that we should have complied with. The government abandoned that at trial, but their position was that CPA order number three bound the contract. Well, that could be true, but that's like saying that, well, the laws of the District of Columbia bind you in addition to any contract you may have with me. But the question really is, is this provision really an amendment in effect to the contract? And what the government is saying, and I'd like your response to it, is, no, all this is saying is that private security firms may be licensed by the government, but that doesn't have anything to do with whether under your particular contract you could hire private security companies. A couple of things. The first is the government's position was that this had contractual effect. That was their position. I understand what Mr. Prouty is saying now would be somewhat different than that, but that was their position, that we were contractually bound by this. It wasn't just like being bound by the laws of the state. But even that wouldn't get you where you need to go, right, because it just says you can get licensed, but it doesn't say that you're permitted under this particular contract. So you both have to get licenses and you have to get some kind of leave under the contract. But what I think this demonstrates is that when the regulators got to addressing the issue, they understood there was a difference between retaining a private security company, that's addressed in paragraph two, and once a private security firm is licensed, they're licensed to carry firearms. That would be every employee. So there's one piece of paper. There's the license to the private security company. That covers the employee. Paragraph, and that concept is nowhere in the contract. Getting a piece of paper to say I can go out and hire, KBR can go out and hire a private security company, that concept is nowhere in the contract. The concept that may be in the contract is paragraph three. Individuals may be authorized to possess firearms for personal use by obtaining authorization from the Ministry of Interior. That's an individual piece of paper. That could be lots of pieces of paper. At most, the authorities, the governments relying on, the contractual authorities, H-21, the Army regulations, et cetera, at most they address that issue of getting a piece of paper for an individual to carry a gun for personal use. They do not address getting a piece of paper for KBR or any of its subs to hire a private security contractor. Can I just, moving aside, you do have a footnote. I think it's footnote 12 in red that talks about the statute of limitations question and broadly suggests in that footnote that if we affirm the board's ruling on the statute of limitations question, it applies across the board to everything. Yes, Your Honor. Yes, Your Honor. That's a pretty sweeping statement and particularly appearing in a footnote. Now, Gray doesn't spend a lot of time responding to that. I think they do respond though and say that's not correct. Are you still adhering to that view? We do, and the basis for it is that the board in its decision, when it gets to talking about the government, there's a single government claim issue in this case. It's for $55 million. It's the subject of the contracting officer's January 2013 final decision. There's only one final decision issue in this case. That's it. And the government in that single final decision asserted a single claim for $55 million, and the board recognized that's what happened on JA-36. But the government, I take it, has already gotten, what is it, $44 million? Roughly. So its assertion of $55 million is really not an assertion for an affirmative remedy of $55 million. It wants to keep the $44 million and get the $11 million extra. So that claim may be articulated in terms of $55 million, but it's really only about the $11 million, isn't it? Well, except for the contracting officer's final decision didn't just assert $11 million. The contracting officer's January 2013 final decision covered everything, covered every penny that's in dispute. Presumably in case something goes wrong with the set-offs. I mean, they're covering themselves both ways, but that doesn't seem to me to give you a right to say, well, since they've lost on the limitations of their affirmative claim, they can't keep the set-offs. Because the set-offs, you have to come in and make claims for them, which you have. We have. On that point, Your Honor, our position is that regardless, the government engaged in self-help on the $44 million. Engaging in self-help did not transform what was, and always has been, a government claim against us into our claim against the government simply because we had to file a claim to try and get the money back. But that's fairly typical in set-off situations, isn't it? I mean, that there is a set-off and the contractor ends up, even though the contractor was paid, but then there was a set-off, the contractor has to come forward with an action in the BCA to recover against the set-off, right? Agreed, Your Honor. And there wouldn't be any special limitations issue there. But the mere fact that we were in the position of being the appellate at the board to determine whose claim this whole dispute involves, we would suggest requires a substantive analysis of who's asking really for things to be changed. It's the government's claim against us. The government claims we improperly used and billed for private security. It's their claim against us. They're the ones that wanted to change the status quo back in 2007. The fact that they were able to engage in self-help doesn't change, in our view, that this was always the government's claim. It remains the government's claim. And then in January 2013, the government treated it as its own claim, covered the entire $55 million, and the board on JA-36 recognized that the government, that the contracting officers filed a decision of 30 January 2013 asserting a government claim of $55,000,625,9155. Yeah, but you're not suggesting the board didn't think that it had dismissed all the people. No, the board did not. The board only dismissed the four of them. So you're not making any kind of collateral stop-all claim or anything like that. You're saying that they wrote $55 million on their claim, and had they written $11 million, you wouldn't be making the charge. It'd be different. That is correct, Your Honor. Okay, I understand. That is correct. I see that my time has expired. Thank you. If you'll excuse me, I will try to keep it brief, Your Honor. On the statute of limitations issue, which is how we ended the argument for Mr. Workmaster, suggests that plainly the notion that there was $44 million at stake before the government filed its claim in January of 2013, and something by virtue of filing that claim in 2013, if that were in fact late, which of course we demonstrated it was not, that all $55 million, the $44 million that was already at stake, would go away, is just nonsensical. It's the notion that there was an appeal that had been going on for many, many years at the Board of Contract Appeals, and that in that case, that became nothing, and it was late, and it was a breach of statute of limitations by virtue of the later filed government claim, which of course it didn't. There was $11 million extra brought in that claim, and that was the issue, and that is, of course, one of the matters we brought in this appeal. I didn't discuss it at length, or actually at all, in our opening part of the argument, frankly because I was responding to Your Honor's other questions that were more pressing, but of course we had no intention of waiving the arguments for which I would refer the Court of Debriefs, but I won't astound them because of the unfairness of Workmaster. With respect to the notion that the CPA overrode the limitations of the contract by its General Order 3, allowing private security contracts, plainly that was not the case. For the very reason that Judge Bryson set out. The CPA was, basically, the government of Iraq at the time, and it said, yes, there can be PSCs. If they exist, they have to follow these rules, but that doesn't say that a contract, you're still able to, under contract, possess those PSCs, because the CPA was not the contracting official for Le Bon Cap 3 contract, which, of course, is a contracted issue here. The interesting argument that Mr. Workmaster makes, and that the Board sort of followed, is that, well, for doctrinal reasons, we don't want other people to be armed. We don't want other people to be doing the job of protecting our contractors and our contractor employees who are accompanying the force. We want to have a... We want to be an exclusive provider as a security principle, but nevertheless, if you bring in somebody who is going to be a super-armed contractor, that's going to be okay. It just doesn't make sense. If individuals cannot carry weapons, if the contract says, you cannot have employees who carry weapons, you certainly can't get around that by saying, we're going to hire somebody whose employees carry weapons, because, of course, the prohibitions against people being armed also apply to subcontractor employees, and private security contractors have weapons. Case 585A3 was brought in front of the Board by KBR to put squarely before it the issues about a prior maternal breach. That case is not before us right now. The case before us is the case involving what the contract permitted. If they're permitted to have weapons because of a breach, the Board must make those findings, and they have not made those findings. For those reasons, the proper result of this case is reversing the Board's determination that the lockout contract permitted the use of PSEs, finding it was wrong that they did not permit the use of PSEs, remanding the statute of limitations issue to determine whether or not using the proper test as you articulated in our briefs, and allowing the Board to do what it wishes and feels appropriate and proper in 585A3. Thank you. Thank you. We thank the Council on the cases submitted, and we're going to adjourn briefly before we reach the other cases. All rise.